# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DAVID GOFF,**

                      **Plaintiff,**

**-vs-**                                                **Case No. 6:04-cv-785-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

                      **Defendant.**

## ORDER

This matter came before the Court for consideration without oral argument on the complaint filed by David Goff seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for social security disability benefits. Doc. No. 1. The Commissioner answered the complaint and filed a certified copy of the transcript of the proceedings before the Social Security Administration ("SSA"). Doc. Nos. 7, 8. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of Florida Local Rule 6.05 for adjudication. Doc. Nos. 9, 10.

**I.**      **PROCEDURAL BACKGROUND.**

On October 4, 2000, Goff applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401 *et seq.*, alleging a disability onset date of June 14, 2000. TR. 105-07. The SSA denied Goff's application both

initially and on reconsideration. TR. 95-96, 98-99. Then, Goff made a timely request for a hearing. TR. 94.

An Administrative Law Judge ("ALJ") held a hearing on June 4, 2002. TR. 36. Goff, who was accompanied by his attorney, testified at the hearing. TR. 36-80.

The ALJ found that Goff had not engaged in substantial gainful activity since June 14, 2000, the alleged onset date of his disability. TR. 21. The ALJ concluded that the medical evidence showed Goff had ischemic heart disease[1] and chest pain of a non-cardiac origin, which were severe impairments, but not severe enough to meet or medically equal one of the impairments listed in the SSA's regulations. TR. 24. In addition, the ALJ found that Goff's depression was not a severe impairment because the medical evidence did not establish that this condition was of long duration. TR. 25. The ALJ found further that Goff's claims of disabling pain were inconsistent with and disproportionate to the medical evidence in the record. TR. 25.

The ALJ found that Goff had the residual functional capacity to perform a full range of light work, which would entail walking, standing, or sitting for up to six hours in an eight-hour workday, frequently lifting or carrying up to ten pounds, and occasionally lifting or carrying up to twenty pounds. TR. 25-26. In reaching this conclusion, the ALJ rejected the opinion of Dr. Gelovich, a physician who had examined Goff, finding that this physician's opinion was inconsistent with the record. Instead, the ALJ credited the opinions of physicians who had not examined Goff, but who had reviewed his medical records. TR. 26.

---

[1] Ischemic heart disease refers to "[l]ocal anemia due to mechanical obstruction (mainly arterial narrowing) of the blood supply." STEDMAN'S MEDICAL DICTIONARY 894 (26th ed. 1995) (hereinafter "Stedman's").

The ALJ found that Goff could not return to his past relevant work.  TR. 26.  Using the Medical-Vocational Guidelines (the "grids"), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Goff could perform a full range of light work and, therefore, that he was not disabled.  TR. 26-27.

Goff requested review of the ALJ's decision.  TR. 9.  On March 22, 2004, the Appeals Council found no basis for changing the ALJ's decision.  TR. 5-7.  Goff timely sought review of this decision by the United States District Court.  Doc. No. 1.

**II.      JURISDICTION.**

The Commissioner issued a final decision after a hearing with respect to Goff's application for disability benefits under OASDI.  Therefore, the Court has jurisdiction of this matter under 42 U.S.C. § 405(g).

**III.     STATEMENT OF FACTS.**

  A.      *Goff's Testimony.*

Goff was born on December 20, 1952.  TR. 45.  He was five feet eight and one-half inches tall and his weight was 182 pounds.  TR. 45.  Goff completed school through the ninth grade and enrolled in the tenth grade but did not complete it.  TR. 47.  Goff previously worked as an electrician and a maintenance supervisor for a school system.  TR. 48.

Goff's disability derived from a heart bypass surgery he underwent in June 2000.  TR. 45.  Goff had had pain every day since the surgery.  TR. 52.  The pain seemed to come from under his ribs and radiated down the left side of his body.  TR. 49-50.  He testified that the pain felt like "carpet burns" on his right and left side, and he ached from his hips and down his leg.  TR. 48-50.

He also had pain in his lower back with bending, squatting, or prolonged sitting.  TR. 72.  Pain medication helped relieve the pain, but did not totally alleviate it.  TR. 50.  He also had problems with high blood pressure.  TR. 49. A physician had recently indicated that Goff might also have rheumatoid arthritis.  TR. 51.

Goff was visiting a psychiatrist who was helping him deal with the stress of no longer being the "bread winner" of a family.  TR. 54.  He experienced frequent nervousness and anxiety.  TR. 56-57.  His short term memory was poor.  TR. 73.  Pressures and deadlines made him nervous.  TR. 120.

Pain made it difficult for Goff to concentrate.  He could not, for example, read a book or watch a movie.  TR. 49.  His medication also made him feel a "buzz" and dizziness.  TR. 49.  He had difficulty sleeping due to pain.  TR. 50, 74.

Any exertion made him dizzy and weak.  TR. 53.  He could walk thirty or forty feet before having to stop due to pain and dizziness.  TR. 57.  He could not stand in one place for longer than five minutes.  TR. 59.  He could bend at the waist and squat, but once he performed one of these movements, it was very difficult to return to an upright position.  TR. 59.  He could sit for thirty to forty minutes.  TR. 61.  He had lost strength in his left side, and his left hand and feet sometimes were numb.  TR. 60-61.  As a result of the left-sided weakness, he could not open a jar.  TR. 59-60.  He could pick up a gallon of milk or a twelve-pack of soda with his right hand, but not with his left.  TR. 60.  He could pick up three or four pounds at most.  TR. 60.

On a typical day, Goff awoke at 6:30 a.m. smoked,[2] drank a cup of coffee, and talked to his wife before she went to work. TR. 63. He would then "sit around," reading the newspaper and walking around the yard. TR. 63. Then, he would "start feeling rough" and lay down for ninety minutes. TR. 63. Often, he would try to undertake some activities, but would become dizzy and would lay down. TR. 63. He could vacuum using a self-propelled sweeper, wash a few dishes, set the table, and put laundry in the washing machine, and he could dust if he was sitting. TR. 65, 68, 70. It would take him fifteen to twenty minutes to vacuum an area of seventy-five square feet. TR. 69-70. Goff had a driver's license, but he did not drive frequently. TR. 46.

Goff used to enjoy working with a computer, but he could no longer concentrate for periods of time required to use a computer. TR. 65. He used to attend church, but had not been able to attend in over two years. TR. 66. Goff generally saw to his own hygienic needs, but he could not shower or shave every day. TR. 70-71.

    B.    *Medical Evidence.*

        1.    <u>Physical Condition</u>.

Goff's medical records chronicle a cardiac catheterization operation that he underwent in June 1991, which was performed by Bruce H. Coyer, M.D. TR. 159-69. This operation, which involved angioplasty and insertion of a pacemaker, was successful. TR. 169. Dr. Coyer's assessments also reflect that Goff had borderline hypertension and hypercholesterolemia. TR. 162.

---

[2] He smoked about a pack of cigarettes each day. TR. 62.

Goff had periodic follow-up appointments after his surgery. A treatment note dated September 5, 1991, reflects that Goff had difficulty sleeping and was tired during the day. The assessment was arteriosclerotic coronary artery disease, borderline hypertension and situational depression. TR. 179. In a subsequent visit, Goff stated that he was off medication and sleeping well, with no chest pain. The assessment reflects that his situational depression was considered to have been resolved. TR. 180.

On September 3, 1993, Goff underwent a Bruce protocol stress test.[3] TR. 171-76. Goff stopped walking after twelve minutes due to fatigue, with no chest pain. TR. 171. The results of this test showed a new abnormality that is not further discussed in the medical records. TR. 171.

On June 10, 2000, Goff underwent a routine stress test to monitor his heart condition. TR. 228. This test revealed several alarming abnormalities. TR. 228. Dr. Coyer performed a cardiac catheterization, which disclosed severe advanced multi-vessel coronary artery disease with evidence of significant "silent" ischemic burden. TR. 217-28. Gary Earle, M.D., reviewed the catheterization films and determined that Goff had significant three-vessel coronary artery disease. Dr. Coyer recommended immediate surgical revascularization (*i.e.*, bypass surgery), which Dr. Earle performed on June 16, 2000. TR. 196, 236-39. A physician noted that Goff's heart size had increased considerably. TR. 193.

After a checkup following this surgery, Samuel J. King, M.D., noted that the surgery had been very successful and that Goff's wounds were healing well. TR. 233-34. Later medical

---

[3] A Bruce protocol stress test is a test that uses electrodes to measure the functioning of various parts of the heart while the subject walks and, eventually, runs on a treadmill which is sped up in specific increments. A.S.M. Systems, Inc., *Treadmill Stress Test* (2005), *at* http://www.heartsite.com/html/regular_stress.html (last visited Sept. 29, 2005).

records indicate that Goff was stable and doing well in the months following his surgery.  TR. 245-46; *see also* TR. 305-16 (exhibiting follow-up appointments with Dr. Joseph in which Goff was reassured that his chest pain was normal and non-symptomatic).

In October 2000, Goff was treated by C. Dominguez, M.D.  Goff complained of chest pain, on and off, and pain in his legs.  TR. 272.  Dr. Dominguez's assessment was coronary artery disease (CAD), chronic obstructive pulmonary disease (COPD), and hypertension (HTN).  TR. 273.

On January 17, 2001, Goff visited David V. Joseph, M.D., complaining of chest pain and numbness, with shortness of breath on exertion.  TR. 276.  Dr. Joseph's impressions were coronary artery disease, chest pain with no evidence of ischemia, controlled hypertension, and hyperlipidemia.[4]  TR. 277.  Dr. Joseph recommended follow-up tests.  On January 23, 2001, a stress test revealed a negative electrocardiogram, normal heart rate and blood pressure response, and no exercise-induced angina or arrhythmia.  TR. 274.  In addition, a Cardiolite study[5] the same day was normal.  TR. 275.

Goff sought emergency room treatment in February 2001 due to chest pain.  TR. 294.  A chest x-ray suggested that Goff had a mild degree of congestive failure and minimal pulmonary

---

[4] Hyperlipidemia refers to "[t]he presence of an abnormally large amount of lipids in the circulating blood." Stedman's at 985.

[5] A Cardiolite study involves the injection of radioisotopes into "the patient while he is resting, [and] are delivered to the heart through the blood stream. Within minutes the SPECT system is used to detect what areas of the heart have absorbed the radioisotopes and therefore are receiving adequate blood flow." Saint Barnabas Health Care System, *New Technology Contributes to Highest Quality of Care*, TODAY MAGAZINE (Spring 2000), *available at* http://www.sbhcs.com/today/spring2000/technology.html (last visited Sept. 29, 2005).

edema.[6]  TR. 286.  Paul Marton, M.D., concluded that Goff had pleurisy, and he prescribed Lortab for pain.  TR. 296.

Goff had follow-up examinations by Dr. Joseph.  He continued to complain of left-sided chest pain.  TR. 305-10.  Dr. Joseph's assessment was coronary artery disease, angina pectoris, stable, hypertension, controlled, and hyperlipidemia.  TR. 305-06.

Goff sought emergency room treatment again in December 2001 due to chest pain.  TR. 317.  The assessment was unstable angina.  TR. 318.  Rajendra Hippalgaonkar, M.D., noted, however, that the pain was atypical for angina.  Dr. Hippalgaonkar's assessment was hypertensive cardiovascular disease, among other things.  TR. 324.

Stephen Gelovich, M.D., began treating Goff in February 2002.  TR. 352.[7]  Goff complained of chest pain, shortness of breath with activity and fatigue after walking one or two blocks.  TR. 352.  He also reported feeling depressed and anxious.  TR. 351.  Medication was ineffective.  TR. 350.  Treatment notes dated May 2002 reflect continuing depression, RSD[8] and increased blood pressure.  TR. 350.  Later in May, Goff complained of pain in his left side, including his hip, and in his back.

Dr. Gelovich diagnosed Goff with coronary artery disease, hyperlipidemia, hypertension, tobacco abuse, depression, fatigue secondary to depression, chronic anterior chest wall pain, and

---

[6] Edema generally refers to an accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities.  Stedman's at 544.

[7] Goff explained that shortly before his hearing, he had changed physicians because his prior physician would not accept his insurance.  TR. 44.

[8] Counsel for Goff defines this acronym as reflex sympathetic disorder, which is an excessive or abnormal response of the sympathetic nervous system following an injury.  Doc. No. 17 at 8 n.7.

hypercatheria with possible RSD. TR. 342. Dr. Gelovich stated that he found Goff's complaints to be credible and that Goff had a medically determinable impairment that could reasonably be expected to cause the pain of which he complained. TR. 344. Dr. Gelovich opined that Goff could not perform sedentary or light work on a full-time basis. TR. 345. He provided the following commentary:

> If Mr. Goff can receive adequate treatment for his anxiety and depression, then he can certainly begin to function much better. Moreover, this may or may not affect his chronic chest wall pain. If this truly is Reflex Sympathetic Dystrophy or Chronic Chest Wall Syndrome (chronic, unremitting irritation of the rib cage and surrounding structures), then his condition may never improve much, if at all. Please attempt to obtain further records from Mr. Goff's psychologist as well as his prior primary care physician, Dr. Anthony Joseph.

TR. 346. In addition, Dr. Gelovich noted Goff's history of coronary artery disease and his complaints of chronic chest pain and fatigue. TR. 342.

In a physical capacities assessment form, Dr. Gelovich opined that Goff could sit two hours and stand less than one hour in an eight-hour workday. He could occasionally lift up to five pounds. He could not use his left arm or hand for simple grasping, pushing or pulling, or fine manipulation. TR. 347. He could not use his legs and feet for repetitive work due to fatigue. Tr. 348. He would require complete freedom to rest frequently throughout the day, including lying down for substantial periods of time. TR. 348.

On May 21, 2002, K. Jay Adcook, M.D., examined Goff's spine in response to his complaints of pain, and Dr. Adcook's impression was diffuse degenerative changes. TR. 341.

2.      Mental Condition.

Gordon Greenhalgh, Ph.D., a licensed psychiatrist, treated Goff between April 3, 2002, and May 7, 2002. TR. 332, 336-39. Goff complained of pain, frustration, and discouragement. TR. 337. Dr. Greenhalgh diagnosed Goff with adjustment disorder, generalized anxiety disorder, and depression. TR. 332. Dr. Greenhalgh completed an evaluation of Goff's mental capacity and found that, due to his mental impairments, Goff would have moderate difficulty in maintaining social functioning, moderately severe restriction in his activities of daily living, severe deficiencies in concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner, and moderately severe repeated episodes of deterioration or decompensation in work or work-like settings. TR. 333. Dr. Greenhalgh further opined that Goff would have moderate limitations in the following activities on a sustained basis in a work setting: (1) using good judgment; (2) performing work requiring regular contact with the public; (3) relating appropriately to co-workers; (4) maintaining appropriate behavior; (5) and responding appropriately to changes in the work setting. TR. 334-35. He opined that Goff would have moderately severe limitations in the following: (1) understanding, remembering, and performing simple instructions; (2) sustaining attention and concentration; (3) achieving assigned goals and responding to time limits; (4) relating appropriately to supervision; (5) responding appropriately to stress and work pressure; (6) maintaining regular production standards; and (7) performing work within a schedule, maintaining regular attendance, and being punctual. TR. 334-35. Dr. Greenhalgh wrote that the majority of Goff's inability to work was due to physical limitations, but his anxiety and depression in reaction to the physical problems would also impair his ability to work. TR. 335.

      C.     *Reviewing Physicians' Opinions.*

On November 10, 2000, Nicholas H. Bancks, M.D., a radiologist, completed a physical RFC assessment of Goff. TR. 261-68. Dr. Bancks opined that Goff would have the following exertional limitations: (1) occasionally lift or carry no more than twenty pounds; (2) frequently lift or carry no more than ten pounds; (3) stand or walk for up to six hours in an eight-hour workday; (4) sit for up to six hours in an eight-hour workday; and (5) unlimited pushing or pulling. TR. 262. Dr. Bancks further opined that Goff frequently would be limited in climbing, stooping, kneeling, crouching, and crawling, and occasionally limited in balancing. TR. 263. Dr. Bancks also found that Goff would have to avoid concentrated exposure to hazards such as machinery and heights. TR. 265.

On March 28, 2001, Eric C. Puestow, M.D., completed a physical RFC assessment of Goff. 297-304. Dr. Puestow's opinions regarding Goff's exertional limitations were the same as those of Dr. Bancks. TR. 298. However, Dr. Puestow opined that Goff would have no postural or environmental limitations. TR. 299, 301.

**IV.   STANDARD OF REVIEW.**

To be entitled to Social Security disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C). The Act provides further that a claimant is not disabled if he or she is capable of performing his previous work. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits. 42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)). Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision. *Id.* While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the

proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

V.     ANALYSIS.

On appeal to this Court, Goff contends that the ALJ erred in several respects. He asserts that due to nonexertional limitations, the ALJ erred by failing to call upon a vocational expert at step five of the evaluation process. He asserts, as well, that the ALJ erred in disregarding the opinion of Dr. Gelovich, a treating physician, in assessing his functional capacity. He contends that the ALJ should have concluded that his mental impairments were severe. Finally, he submits that the ALJ erred in the finding that he was not totally credible.

I begin with the ALJ's decision to give little weight to Dr. Gelovich's opinion based on his failure to support his opinion with any specific information. The ALJ's analysis ignores both the treatment records and the questionnaire Dr. Gelovich completed in which he described in some detail the basis of his assessment. He noted that examination in May 2002 had shown that Goff experienced "exquisite tenderness to light palpation over the [left] side of [his] torso . . . ." TR. 343. He acknowledged that the pain could be exacerbated by depression or anxiety, but he noted that he needed to exclude other possible causes such as reflex sympathetic dystrophy and chronic chest wall syndrome. TR. 344. Thus, the ALJ's stated reasons for disregarding Dr. Gelovich's functional capacity assessment are not supported by substantial evidence in the record.

Furthermore, if the ALJ's decision to reject Dr. Gelovich's functional capacity assessment were sustained, the ALJ would then be left with an insufficient record from which to determine Goff's RFC. The reviewing physicians' RFC assessments are "not dispositive, as [their]

conclusions are from . . . non-treating, non-examining physician[s], and the other medical records express no indication of [the claimant's] ability to perform [his] past work." *Johnson v. Barnhart*, No. 04-14581, 2005 WL 1523499, at *5 (11th Cir. June 29, 2005) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279-81 (11th Cir. 1987)). Thus, once the ALJ rejected the opinions of all examining and treating physicians regarding Goff's RFC, she had a duty to more fully develop the record through vocational expert testimony, rather than credit the opinions of non-treating, non-examining physicians. *See Johnson*, 2005 WL 1523499, at *5. Accordingly, remand is required to permit the SSA to develop the record more fully.

On remand, the SSA should also consider Goff's complaints of pain and other subjective symptoms under the pain standard applicable in this circuit. The medical records establish that Goff has coronary artery disease and hypertension, which reasonably could cause the pain, dizziness, and fatigue about which Goff complained. If the Commissioner discredits the claimant's subjective testimony, she "must articulate explicit and adequate reasons for doing so." *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995).

## VI.   CONCLUSION.

For the reasons stated above, it is **ORDERED** that the decision of the SSA is **REVERSED** and the case is **REMANDED** for further proceedings. It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and, thereafter, close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 29, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record
Unrepresented Parties